FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| RED ROCK ANALYTICS, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br>SAMSUNG ELECTRONICS AMERICA,<br>INC., SAMSUNG SEMICONDUCTOR, INC.,<br>and SAMSUNG AUSTIN<br>SEMICONDUCTOR, LLC,<br><br>*Defendants.* | Civil Action No. 2:17-cv-00101-RWS-RSP<br><br>**JURY**<br><br>**FILED UNDER SEAL** |

## DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF
## ROY WEINSTEIN AND CHRISTOPHER JONES

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................................... 1

        A.      The '313 Patent ............................................................................................. 1

        B.      Mr. Weinstein's Damages Calculations........................................................ 3

        C.      Samsung's Licensing Practices...................................................................... 5

III.    LEGAL STANDARD................................................................................................. 6

IV.     ARGUMENT.............................................................................................................. 8

        A.      Mr. Weinstein Claims Future Damages Without Sufficient Evidence .................. 8

        B.      Mr. Weinstein Fails to Apportion the Value of the 802.11 Standard .................. 10

        C.      Dr. Jones and Mr. Weinstein Fail to Apportion the Value of the '313
                Patent............................................................................................................. 11

        D.      Mr. Weinstein's Purported Lump-Sum Damages Figure Is a Disguised
                Running Royalty, Which Disregards Samsung's Actual Licensing
                Practices ........................................................................................................ 14

V.      CONCLUSION........................................................................................................... 15

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bianco v. Globus Med., Inc.*,
  53 F. Supp. 3d 929 (E.D. Tex. July 12, 2014) ...........................................................................8

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
  977 F.2d 1555 (Fed. Cir. 1992)...................................................................................................7

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015).......................................................................................7, 10, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..............................................................................................................1, 6, 9

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014)...........................................................................................7, 11, 13

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
  No. 2:15-cv-00011-RSP, 2018 WL 3089701 (E.D. Tex. Mar. 7, 2018)....................................8

*Finjan, Inc. v. Sophos, Inc.*,
  No. 14-CV-01197-WHO, 2016 WL 4268659 (N.D. Cal. Aug. 15, 2016) ..........................8, 10

*Garretson v. Clark*,
  111 U.S. 120 (1884)....................................................................................................................7

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).....................................................................................................................9

*IP Innovation L.L.C. v. Red Hat, Inc.*,
  705 F. Supp. 2d 687 (E.D. Tex. 2010)........................................................................................6

*Kumho Tire Co., Ltd., v. Carmichael*,
  526 U.S. 137 (1990).....................................................................................................................6

*Lucent Techs., Inc. v. Gateway*,
  580 F.3d 1301 (Fed. Cir. 2009)..........................................................................................7, 8, 15

*Oiness v. Walgreen Co.*,
  88 F.3d 1025 (Fed. Cir. 1996).....................................................................................................8

*Owens v. Ford Motor Co.*,
  297 F. Supp. 2d 1099 (S.D. Ind. 2003) .....................................................................................14

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

*ResQNet.com, Inv. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)...............................................................................................15

*Shockley v. Arcan, Inc.*,
    248 F.3d 1349 (Fed. Cir. 2001)...........................................................................................8, 9

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F. 3d 1292 (Fed. Cir. 2011)............................................................................................10

*VirnetX Inc. v. Cisco Sys. Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)..........................................................................................7, 14

**Rules**

Fed. R. Evid. 104 .....................................................................................................................1

Fed. R. Evid. 702 ...................................................................................................................1, 6

iii

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## I.  INTRODUCTION

The Sasmsung Defendants respectfully submit this motion, pursuant to Federal Rules of Evidence 104 and 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and the Amended Docket Control Order (D.I. 147), seeking exclusion of improper expert testimony proffered by Red Rock Analytics' experts Mr. Roy Weinstein and Dr. Christopher Jones in connection with Red Rock's claims for damages based on Samsung's alleged infringement of U.S. Patent 7,346,313 (the "'313 Patent").

Red Rock's experts' opinions violate Rule 702's core tenet that such opinions must be the "product of reliable principles and methods," as follows:

1.  Mr. Weinstein speculatively calculates damages through the 2025 expiration of the '313 Patent, without conducting a sufficiently rigorous forecast analysis;

2.  Mr. Weinstein fails to account for the benefits of standardization that may have accrued to the ▮▮▮ Patent underlying the allegedly comparable license agreements on which Mr. Weinstein relies to derive a royalty rate;

3.  Dr. Jones—and thus Mr. Weinstein—do not account for all contributors to WiFi transceiver performance, including other calibration methods and design components, and thus do not properly apportion Red Rock's damages; and

4.  Mr. Weinstein disregards Samsung's extensive history of lump-sum license agreements to instead calculate damages based on a running royalty.

## II.  STATEMENT OF FACTS

### A.  The '313 Patent

As detailed at greater length in Defendants' Motion for Summary Judgment of Non-Infringement, filed herewith, Red Rock's '313 Patent is directed to a purported invention to address a particular aspect of I-Q gain balance calibration techniques—but does not purport to

1

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

invent I-Q calibration itself.  *See* '313 Patent[1] at 1:62-2:6; 5:18-31; 7:63-8:2; 8:43-47.  Mr. Weinstein alleges that "[t]he products accused in the instant matter implement certain of the IEEE 802.11 Standard protocols, namely 802.11n and 802.11ac" and that "use of the '313 patent increases accuracy, reduces errors, and allows use of the highest constellation densities provided in the 802.11n and 802.11ac Standards."  Weinstein Rep. ¶¶ 30–31.

Mr. Weinstein states that "using I/Q calibration results in an EVM improvement,"[2] and that this improvement "enables" certain data-rate modes specified in the 802.11n and 802.11ac WiFi standards.  Weinstein Rep. ¶¶ 143–47, 183.  This rests on the report of Red Rock's technical expert Dr. Chris Jones.  *Id.* ¶¶ 143–47; Weinstein Dep.[3] 107:22–25, 117:2–118:4.

Dr. Jones's analysis of this issue proceeds as follows.  First, using his own methodology, he ███████████████████████████████████████████████████████ ███████████████████.  Jones Rep. ¶¶ 462, 463.  Then, from transceiver specifications, he ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████.  *Id.* ¶¶ 450, 468–69; Jones Dep. 112:13–113:3 (████████████████████████████████████████);  *see also, e.g.*, Jones Dep. 109:16–110:12, 114:14–115:9, 118:5–23.  He then ██████████ ████████████████████████████████████████████████ and opines that this entire difference—which he names "Minimum Tx EVM Improvement"—is entirely attributable to the '313 Patent invention.  *Id.* ¶¶ 466, 468 ("██████████████████████ ████████████████████████████████████████████████████").

---

[1] All documents cited herein are exhibits to the Declaration of Joseph M. Abraham.

[2] Error Vector Magnitude ("EVM") is a measure of transmitter or receiver performance.  EVM is measured in decibels ("dB"), and lower (more negative) EVM indicates better performance.

[3] All citations to the Weinstein and Jones depositions are to the respective rough transcripts.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Second, Dr. Jones presents the EVM requirements of WiFi standards IEEE 802.11n and 802.11ac. *Id.* ¶¶ 486–95. Each standard specifies a series of data-rate modes, with higher-rate modes generally having more stringent EVM requirements. *Id.* Dr. Jones compares the EVM improvements purportedly "achieved by" I-Q calibration to the standards' EVM requirements. Dr. Jones concludes that "an uncalibrated Broadcom or Qualcomm Wi-Fi chip could not comply with the 802.11n or 802.11ac standards" and that "I-Q gain calibration using the '313 Patent invention enables the Infringing Products to comply with the 802.11n and 802.11ac standards" because of the "Minimum Tx EVM Improvement." *Id.* ¶¶ 503–505. Notably, Dr. Jones admits ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but does not address the contribution of ▮▮▮▮▮▮▮ on his "Minimum Tx EVM Improvement." *Id.* ¶¶ 448–50, 465–68. For example, he does not explain how or if this "improvement" is achievable without the transceiver performing ▮▮▮▮▮▮▮. Instead, by attributing the entirety of the "improvement" solely to the '313 Patent, he concludes that the "'313 Patent invention enables" or "unlock[s]" certain mandatory data-rate modes specified in the standards. *Id.* ¶¶ 506–10. Dr. Jones thus effectively opines that the '313 Patent is standards-essential.

Ultimately, Dr. Jones opines that the '313 Patent "enables" the accused products to achieve ▮▮▮ of the data-rate modes specified in the IEEE 802.11n and 802.11ac WiFi standards. *Id.* ¶¶ 509–510. Mr. Weinstein then further averages these percentages in support of his reasonable royalty calculation. *See* Weinstein Rep. ¶¶ 185–86, 193, 196.

### B.    Mr. Weinstein's Damages Calculations

Mr. Weinstein, citing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ calculates purported lump-sum damages. Weinstein Rep. ¶ 158. In support of his calculation, Mr. Weinstein relies on three license agreements between ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ and each of ▮▮▮▮▮▮▮▮▮. *See id.* ¶¶ 173, 178–179;

3

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

*see also* SAMRRA00151675–94 ("████████ License"), ████████ ("████ ████ License"), ████████ ("████████ License").  The subject licensed asset of all three agreements is ████████ Patent.  *See id.* ¶¶ 67, 134–135.  The ████████ license agreement settled a litigation initiated by ████ against ████ and involves a lump-sum payment of ████████████████.  *See id.* ¶ 67.  The ████████ and ████ ████ Licenses explicitly provide for per-unit payments based on the number of units sold by the licensees.  *See* ████████ License Ex. A, ████████ License Ex. B.

To calculate damages, Mr. Weinstein: (1) derives a per-unit payment figure relating to the ████████ License (*see* Weinstein Rep. ¶¶ 173–177 & Ex. 12); (2) calculates an average involving his derived per-unit royalty from the ████████ License, as well as the per-unit rates detailed in the ████████ and ████████ Licenses (*see id.* ¶ 182); (3) further calculates a modified per-unit royalty for Red Rock's '313 Patent based on a comparison of the '313 Patent against ████████ Patent[4] (*see id.* ¶¶ 193, 196); and (4) sums those individual per-unit royalties and then discounts those amounts to present value to arrive at a single lump-sum payment (*see id.* ¶¶ 201–206 & Exs. 13–14, Weinstein Dep. 65:3–6).

In addition to calculating damages through the date of trial,[5] Mr. Weinstein also calculates estimated damages through the January 2025 expiration of the '313 Patent.  *See* Weinstein Rep. ¶¶ 204–06 & Ex. 14.  In support of his calculation of post-trial damages, Mr.

---

[4] Mr. Weinstein's comparison of the '313 and ████ Patents involves both a purportedly "most conservative" and a purportedly "more reasonable" methodology, the distinctions between which are irrelevant to this *Daubert* motion.  Weinstein Rep. ¶¶ 185–186.

[5] Although not used in his damages calculations, Mr. Weinstein cites Samsung's total revenues generated by sales of products including allegedly infringing chipsets.  *See* Weinstein Rep. ¶¶ 129–130.  Mr. Weinstein testified that the specific amount of Samsung's revenues was not relevant to his opinions, and that such revenues went only to the commercial success of the accused products (which Samsung does not dispute).  *See* Weinstein Dep. 17:6–12.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Weinstein's calculations simply hold constant Samsung's sales of accused products during 2017 and project those sales figures through January 2025 (prorating for the final year):



Weinstein Rep. Ex. 14; *see also* Weinstein Dep. 43:4–13. Mr. Weinstein testified that he did not analyze "which specific models [he] expect[s] to increase in sales and which specific models [he] expect[s] to decrease in sales" post-2017, or "whether sales of [Samsung] handset and tablet models that incorporate non-accused chip sets are expected to increase or decrease over the 2018 to 2024 time frame." Weinstein Dep. 55:18–56:9.

Mr. Weinstein's calculated damages through patent expiration are approximately ▮▮ again as high as his calculated damages through trial. *Compare* Weinstein Rep. ¶ 204 *with id.* ¶ 201 (▮▮ vs. ▮▮ for Mr. Weinstein's "most conservative" methodology); *compare id.* ¶ 205 *with id.* ¶ 202 (▮▮ vs. ▮▮ for Mr. Weinstein's "reasonable" methodology).

## C.    Samsung's Licensing Practices

Samsung produced over twenty license agreements in this case, none of which involved a running-royalty payment term. *See* Weinstein Rep. Ex. 6 at col. 10. Mr. Weinstein agreed that

5

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

all Samsung license agreements that he reviewed in connection with this case involve lump-sum payment terms.  *See* Weinstein Dep. 64:14-23.  Hojin Chang, Samsung's Vice President in charge of IP transactions, testified that Samsung ███████████████████████ ████████, because Samsung ███████████████████████████████████ █████████████████████████████████████████.  Chang Tr. 55:20–22, 56:6–8.  Mr. Chang further testified that Samsung did not know ██████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████.  *See id.* 134:5-135:13.

## III.  LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony is admissible only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

This Court has a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589; *see also IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010) ("This [C]ourt must exclude testimony that does not meet the requirements of Rule 702.").  The Supreme Court has further emphasized that district courts have wide discretion both in determining the relevant factors to be employed in assessing the reliability of an expert's testimony, and in determining whether that testimony is in fact reliable.  *See Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 141-42 (1990).  The proponent of the expert testimony must prove reliability by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592-93 & n.10.

6

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Federal Circuit jurisprudence regarding patent damages is extensive.  Damages analyses must "apportion . . . the patentee's damages between the patented feature and the unpatented features" of the accused products.  *VirnetX Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  "[T]he ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  The Court must "exercise[] its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment . . . reach the jury."  *VirnetX*, 767 F.3d at 1328.

For standard-essential patents ("SEPs"), "the patented feature must be apportioned from all of the unpatented features reflected in the standard . . . [and] the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology."  *Ericsson v. D-Link*, 773 F.3d at 1232; *see also CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1305 (Fed. Cir. 2015) ("reasonable royalties for SEPs generally . . . must not include any value flowing to the patent from the standard's adoption").

If a patentee calculates damages in reference to comparable licenses, the patentee bears the burden to prove "whether the licenses relied on by the patentee in proving damages are sufficiently comparable to the hypothetical license at issue in suit," which burden includes accounting for "fundamental differences . . . between lump-sum agreements and running-royalty agreements."  *Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1325, 1330 (Fed. Cir. 2009).

Where a patentee seeks to recover damages based on future infringement, "[t]he burden of proving future injury is commensurately greater than that for damages already incurred, for the future always harbors unknowns."  *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed. Cir. 1992).  In such circumstances, "a patentee may supply adequate

7

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

evidence to enable the fact-finder to responsibly estimate future losses based on sound economic models and evidence, not pure guesswork." *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001), citing *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996); *see also Finjan, Inc. v. Sophos, Inc.*, No. 14-CV-01197-WHO, 2016 WL 4268659, at *5 (N.D. Cal. Aug. 15, 2016) ("Layne-Farrar's estimate of steady sales through the end of 2025 and 2032, based only on current growth, is too speculative to assist the jury in assessing a reasonable future damage amount."); *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 942 n.3 (E.D. Tex. July 12, 2014) (Bryson, J.) (describing prior ruling that excluded testimony about future damages where expert "sought to quantify the future damages by estimating future sales of the accused products and extending that projection over a period of 15 years").  A patentee may calculate a lump-sum damages award "based on . . . realistic projections of future sales, but the lump sum must be based on a product accused in the lawsuit and found by the jury to infringe." *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-cv-00011-RSP, 2018 WL 3089701, at *7 (E.D. Tex. Mar. 7, 2018), citing *Lucent*, 580 F.3d at 1333 (granting new trial on damages).[6]

## IV.    ARGUMENT

### A.    Mr. Weinstein Claims Future Damages Without Sufficient Evidence

Mr. Weinstein's future damages calculation involves projecting Samsung's 2017 sales for an additional seven years and five days.  *See* Weinstein Rep. Ex. 14.  But his simplistic projection fails to calculate future damages "based on sound economic models and evidence, not pure guesswork." *Shockley*, 248 F.3d at 1362.  Mr. Weinstein acknowledged that "Samsung

---

[6] The *Ericsson v. TCL* Court later vacated its award of a new damages trial, but without disturbing its ruling that calculation of future damages may not be based on products other than those proven to infringe in the litigation at issue. *See id.* D.I. 483, at *13 (E.D. Tex. May 10, 2018) ("while the jury's assessment includes damages for future sales of accused products . . . , the award did not necessarily include damages for future sales of unaccused products").

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

could release products that have not yet been accused by Dr. Jones in his [infringement] report";

that Samsung might have "stopped selling" some of the accused products that form the basis of

his calculation of future damages; and that it was "possible" that "sales of new products for

which Red Rock has not proven infringement may displace sales of" accused products.

Weinstein Dep. 46:4-10, 48:7-13, 50:4-7.  Mr. Weinstein further admitted that his report did not

analyze possible increases or decreases in Samsung's sales of accused models or models

containing non-accused WiFi chipsets.  *See* Weinstein Dep. 55:18–56:9; *compare* Jones Rep. Ex.

C (listing all products and chipsets accused in this case) *with* Samsung's Second Supplemental

Response to Red Rock's Interrogatory No. 1 (detailing non-accused chipsets manufactured by,

*inter alia*, ███████████████████████████).  The purely speculative

nature of Mr. Weinstein's future damages calculation is further evidenced by his complete failure

to consider the possibility of decreases in overall market size (possibly due to smartphone

saturation) or in Samsung's share of that market.

Accordingly, Mr. Weinstein's purported "forecast" of constant sales of the products

actually accused of infringement by Red Rock—which he justified at deposition by invocation of

the alleged lack of available non-infringing alternatives—is based on nothing other than

reference to his general "experience with this kind of data . . . that sales of individual models

fluctuate from time to time.  Some increase, and some decrease."  *See* Weinstein Dep. 46:4–16,

54:22–55:7.  This is quintessential *ipse dixit* testimony that must not reach the jury.  *See General*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit opinion evidence that is connected to existing data

only by the *ipse dixit* of the expert").  As in other instances where an expert has projected future

damages based solely on an "estimate of steady sales," Mr. Weinstein's opinion as to future

9

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

damages should be excluded. *Finjan*, 2016 WL 4268659 at *5.[7]

> **B.    Mr. Weinstein Fails to Apportion the Value of the 802.11 Standard**

In December 2015, the Federal Circuit issued a decision relating to CSIRO's assertion of

its '069 Patent—███████████████████████████████████████████. *See*

*CSIRO v. Cisco*, 809 F.3d 1295.  In *CSIRO v. Cisco*, much as Mr. Weinstein relies on ████

licenses here, the district court adopted royalty rates from CSIRO's prior licensing negotiations

as a starting point for its damages calculation. *See id.* at 1300 ("the district court created its own

[methodology] based on[, *inter alia*,] CSIRO's 2004 Rate Card offer").[8]  On appeal, the Federal

Circuit held that the district court had critically erred by not considering whether "CSIRO's Rate

Card rates attempt to capture at least some value resulting from the [802.11] standard's

adoption" and by "fail[ing] to account for the possibility that the $0.90 and $1.90 per unit rates

that it used as a starting point may themselves be impacted by standardization." *Id.* at 1305.

The ████ licenses on which Mr. Weinstein relies predate the Federal Circuit's *CSIRO*

decision, and thus could not have reflected the Federal Circuit's subsequent guidance. *See*

Weinstein Rep. Ex. 11 at 1 (████████ and ████████ Licenses, April 2009), Ex. 6 at

6 (████████ License, January 2015).  And all three ████ license rates fall within the

range for which the Federal Circuit subsequently directed the district court to analyze potential

effects of standardization. *Compare* Weinstein Rep. ¶¶ 177, 179, 182 *with CSIRO v. Cisco*, 809

F.3d at 1305.  Mr. Weinstein admitted that he did not "undertake any analysis . . . regarding the

---

[7] Mr. Weinstein's mention of Samsung's total revenues would also, if presented at trial, violate explicit Federal Circuit prohibition. *See* Weinstein Rep. ¶¶ 129–130; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F. 3d 1292, 1320 (Fed. Cir. 2011) ("[D]isclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.").

[8] CSIRO's Rate Card was "a form license offer" developed by CSIRO for use with prospective WiFi industry licensees.  809 F.3d at 1298.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

standard essentiality of the ▓▓ patent relative to the 802.11 WiFi standards." Weinstein Dep.

95:4–10. Mr. Weinstein has thus relied on



, without undertaking the corrective analysis (i.e.,

accounting for any contributions to the ▓▓ Patent's licensed royalties based on standard-

essentiality) specifically prescribed by that court. Accordingly, Mr. Weinstein's methodology

should be excluded. *See CSIRO v. Cisco*, 809 F.3d 1295; *Ericsson v. D-Link*, 773 F.3d 1201.

## C.    Dr. Jones and Mr. Weinstein Fail to Apportion the Value of the '313 Patent

Dr. Jones's analysis fails to apportion the purported value of the '313 Patent in two

critical ways, each of which causes his analysis to capture the value of un-patented features, and

renders his opinions regarding the benefits of the '313 Patent unreliable and unable to assist the

jury in applying the correct legal standards of apportionment. Mr. Weinstein's analysis simply

relies on Dr. Jones's flawed conclusions, so his opinion must be excluded as well.

First, by equating the '313 Patent with I-Q calibration generally, Dr. Jones fails to assess

the incremental value of the '313 Patent beyond the prior art. As discussed above, Dr. Jones's

analysis of the alleged benefits of the '313 Patent is based on a comparison of pre-I-Q calibration

versus post-calibration EVM specifications, "post-calibration" including many other techniques

that improve EVM beyond I-Q gain imbalance calibration. Jones Rep. ¶ 456. Dr. Jones thus

assigns to the '313 Patent the "EVM improvement achieved by" calibration and other design

techniques generally, rather than the specific improvement in EVM achieved by the '313 Patent.

It is improper to equate calibration generally, let alone I-Q calibration, with the '313

Patent. Dr. Cafarella never claimed that he invented even I-Q calibration; rather, the '313

Patent's claims are narrowly drawn to a specific mechanism for I-Q gain balance calibration, and

recite a loopback path ("signal path for injecting"), a "calibration RF signal" that "includes a

11

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

calibration cycle," and various other limitations.  *See, e.g.*, '313 Patent claim 7.  Indeed, the '313 Patent itself describes "a conventional prior art approach to calibration of the baseband gains" that is ***not*** within the scope of the claimed invention.  '313 Patent 4:54–55, 7:28–30, figs. 3a, 3b.[9] Dr. Jones admitted this was a "reasonable approach."  Jones Dep. 97:10–18, 98:21–99:9.

Dr. Jones does not address the incremental contribution of the '313 Patent over the prior art ***at all***, and instead assumes incorrectly that Dr. Cafarella invented I-Q calibration.  For example, Dr. Jones has not made any assessment of what EVM improvement was achievable using the I-Q calibration techniques of the prior art.[10]  It is thus not possible, based upon Dr. Jones' analysis, to compare the '313 Patent with prior art approaches to determine its incremental value.  Mr. Weinstein relies on this opinion in computing the purportedly reasonable royalty, so his opinion suffers from the same deficiency.  *See, e.g.*, Weinstein Rep. ¶ 143 ("using I/Q calibration results in an EVM improvement").

Second, Dr. Jones fails to apportion the value of the '313 Patent among the many non-infringing aspects of WiFi transceiver design that also affect EVM.  Mr. Jones explicitly identifies

---

[9] During prosecution, when the examiner rejected the claims over a prior art I-Q gain calibration approach described by Mohindra, the applicant narrowed all of the independent claims to add the "calibration cycle" limitation.  *See* Amendment & Remarks 3, 18, Sept. 26, 2007, '313 Patent File History; U.S. Pat. No. 6,717,981 at 1:66–2:2, 2:48–54 ("Mohindra").  Dr. Jones failed to meaningfully consider the prosecution history and failed to consider Mohindra at all in his analysis.  *See* Jones Rep. ¶ 90; Jones Dep. 83:25–84:5, 86:12–16, 88:1–24, 89:6.

[10] Other intrinsic references cited on the face of the '313 Patent further show that other I-Q calibration mechanisms were known.  *See, e.g.*, U.S. Pat. No. 6,298,096 ("Method and Apparatus for Determination of Predistortion Parameters for a Quadrature Modulator"); U.S. Pat. No. 5,847,619 ("Method and System for Calibrating a Quadrature Phase Modulator"); U.S. Pat. Pub. 2003/0206603 ("Systems and Methods to Provide Wideband Magnitude and Phase Imbalance Calibration and Compensation in Quadrature Receivers").

12

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER



Jones thus admits there are at least four "categories" of "factors" other than I-Q gain imbalance that are important to transceiver EVM. But he fails to assess the value or importance of any of these other factors or categories important to EVM, let alone any of the components or techniques important to meeting other aspects of the WiFi standard. Instead, he assigns to the '313 Patent all the credit for "enabling" compliance with certain required data-rate modes.

Where a patent is necessary to meet a standard, "special apportionment issues . . . arise," including that "the patented feature must be apportioned from all of the unpatented features reflected in the standard." *Ericsson*, 773 F.3d at 1232. Whether Dr. Jones contends the '313 Patent is in fact "standards-essential" or is merely "standards-important," the concern is the same. Dr. Jones makes no effort to apportion. He fails to assess the value of ***any*** of the other factors that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (let alone other technologies necessary to meet the standards). *Id.* ¶ 450. In particular, although admitting their importance, he fails to assess whether and to what extent technologies relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* ¶ 450, also "enable" standards compliance. Dr. Jones opines, "[j]ust as a chain can never be stronger than its weakest link, a transceiver can never be more accurate than its greatest source of error." *Id.* ¶ 449. But he improperly apportions the value of the entire chain (standards-compliant EVM) to just one link

13

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

(I-Q gain balance calibration).  *See* Jones Dep. 110:5–12, 118:19–23, 122:9–13.

This failure to apportion renders Dr. Jones's opinions that the '313 Patent "enables" standards compliance and that it "enables" certain data-rate modes unreliable, and they must be excluded.  "A Patentee must in every case give evidence tending to separate or apportion . . . the patentee's damages . . . and such evidence must be reliable and tangible, and not conjectural or speculative."  *VirnetX*, 767 F.3d at 1326 (internal quotations omitted).  Here, evidence of apportionment is totally absent.  As Mr. Weinstein's comparison of the Red Rock '313 Patent against the ███████ Patent relies entirely on flawed inputs received from Dr. Jones, Mr. Weinstein's opinions should be similarly excluded.  *See Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1108 (S.D. Ind. 2003) ("Although a testifying expert may rely on another expert's opinion, the testifying expert's opinion should be rejected if the underlying basis is unreliable.").

**D.      Mr. Weinstein's Purported Lump-Sum Damages Figure Is a Disguised Running Royalty, Which Disregards Samsung's Actual Licensing Practices**

Mr. Weinstein's damages calculation impermissibly departs from the evidentiary record.

First, despite all evidence to the contrary, Mr. Weinstein converts the lump-sum ███████ ███████ License into a running royalty equivalent.  *See* Weinstein Rep. ¶¶ 173–177 & Ex. 12. In so doing, Mr. Weinstein disregards that none of the Samsung agreements produced in this case actually involved running-royalty payments.  *See* Weinstein Rep. Ex. 6 at col. 10.  Mr. Weinstein further discounts Samsung's 30(b)(6) witness Mr. Chang, who noted that Samsung ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.  Chang Tr. 55:20–22, 56:6–8.  Mr. Weinstein also neglects Mr. Chang's testimony that Samsung knew neither █████████████████████████████████████████████ ████████, nor ████████████████████████████████████.  *Id.* 134:5-135:13.

14

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Second, Mr. Weinstein's report purports to present his calculations as lump-sum figures, in view of Samsung's ███████████████████████████████ Weinstein Rep. ¶¶ 158, 201–206.  But Mr. Weinstein acknowledged that his calculated lump sums were fairly characterized simply "as a summation and net present value discounting of a running royalty."  Weinstein Dep. 65:3-7.  Mr. Weinstein thus again disregards that all Samsung agreements produced in this case—including the ██████████ License,[11] which addresses the ███ Patent that Dr. Jones finds to be singularly comparable to the '313 Patent—are not similarly based on a summation of a running royalty.  Mr. Weinstein apparently deems application of a running royalty to be appropriate merely because the evidentiary record does not explicitly preclude it.  *See* Weinstein Dep. 66:24-67:2 ("while Samsung ███████████████████ . . . it doesn't ████ ████████████████████████████████████").

Mr. Weinstein's departures from the record—which include neglecting to account for the "fundamental differences [that] exist between lump-sum agreements and running-royalty agreements"—thus fail to heed the Federal Circuit's admonition to ensure that "the licenses relied on by the patentee in proving damages are sufficiently comparable to the hypothetical license at issue in suit."  *Lucent*, 580 F.3d at 1325, 1330.  By failing to account for these "fundamental differences," Mr. Weinstein's calculated form of relief is proven to be the product of an unreliable methodology, which this Court should exclude.  *See id.* at 1330.

V.    **CONCLUSION**

For the reasons discussed above, Samsung respectfully requests that the Court exclude the referenced portions of the expert testimony of Mr. Weinstein and Dr. Jones.

---

[11] The Federal Circuit has stated that reliance on settlement agreements, such as the ████ ████ License, in relation to calculation of reasonable royalty damages should be undertaken with caution.  *See, e.g.*, *ResQNet.com, Inv. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010).

15

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

DATED:  October 26, 2018                              Respectfully submitted,


By: */s/ Jeffrey B. Plies*
Michael Barta – Lead Attorney
DC Bar No. 431663
michael.barta@dechert.com
Dechert LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3300

Jeffrey B. Plies
TX Bar No. 24027621
jeffrey.plies@dechert.com
Dechert LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
(512) 394-3000

S. Michael Song
CA State Bar No. 198656
michael.song@dechert.com
Dechert LLP
2440 W. El Camino Real, Suite 700
Mountain View, CA 94040
(650) 813-4813

Melissa Richards Smith
melissa@gillamsmithlaw.com
Gillam & Smith, LLP
303 South Washington Avenue
Marshall, TX 75670
903/934-8450
Fax: 903/934-9257

***Attorneys for Samsung Electronics Co., Ltd.
Samsung Electronics America, Inc.,
Samsung Semiconductor, Inc., and Samsung
Austin Semiconductor, LLC***

16

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this notice was served on all counsel of record who have consented to electronic service as this district requires in accordance with Local Rule CV-5(a)(7)(D) on this 26th day of October, 2018.

*/s/ Jeffrey B. Plies*
Jeffrey B. Plies

## CERTIFICATE OF CONFERENCE

Per Local Rule CV-7(h)-(i), counsel for Red Rock Analytics and counsel for Samsung conferred via teleconference on October 26, 2018.  I participated on behalf of Samsung.  Alden Harris and Miranda Jones participated on behalf of Red Rock Analytics.  Despite good faith efforts, no agreement regarding Samsung's motion to exclude expert testimony could be reached, and the parties ended in an impasse.  Red Rock Analytics has indicated that it is opposed to this motion.

*/s/ Jeffrey B. Plies*
Jeffrey B. Plies

17

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

I certify that the foregoing document and attachments thereto are authorized to be filed

under seal pursuant to the Protective Order entered in this case.


<u>*/s/ Jeffrey B. Plies*</u>
Jeffrey B. Plies

18